Good morning. Good morning, Your Honor. May it please the Court. My name is Thomas Doves. I'm from the Labaton Firm. I represent the appellant to the New Mexico State Investment Council. The issue before the Court today on this appeal by Judge Reel's decision is whether we pled sufficient allegations to meet the requirement of a scienter under the PSLRA and under the Supreme Court's decision in Tell Labs. I will address that primarily. We will get to loss causation and time permitting at the end or on rebuttal, which, of course, we believe is not properly before the Court. As an initial matter, we all agree that the question, the statement in controversy is an E&Y statement with respect to the 2005 certification of the financials. That certification is atypical. It's atypical because it not only says 2005, it goes back by its very terms, 2005, 2004, 2003. Beyond that, it's clear and it's not in dispute that if you have an options decision backdated, the impact of that is over four years because it's expensed over four years. So a statement that the 2003 financials are prepared in accordance with GAAP by definition because there will be something on those financials dealing with what happened four years before. So we have a somewhat broader cloth than we sometimes paint on in terms of what the statement is. But, counsel, we do know that a failure to comply with GAAP standards or accepted accounting principles, that doesn't make it in terms of the scienter allegations that are required. Standing alone, it generally is true. A whole bunch of GAAP violations together with other things may. It is not our argument, however, because there was one GAAP violation that is sufficient. Indeed, our argument here is that there are three clusters of allegations, each independently satisfy and create a cogent inference under TELAPS. The first one of those deals with the 2003 reforms. This is a very atypical, unique case. You have in 2003 the company on its own internally reforming itself and saying we are no longer going to have backdated options and admitting that the options previously granted pre-2003 were, for lack of a better word, bad or incorrect. We say that Ernst & Young not only knew about it, but they presided over that reform internally. And, therefore, in their mind, they knew that the client had said to E&Y and they knew the backdating options process was bad pre-2003. With that knowledge, they could not, in 2005, had said that the financials for 2003, 4, and 5 are all okay, knowing that there had been a problem because the company admitted it and, indeed, to the company's credit, they had reformed it. So that's number one. That's our inference. What does the other side say about the inference? What is the inference on the other side of the equation that the court should look at under TELAPS? We know. Page 39 of their brief says that their reforms were nothing more than, quote, routine actions in response to the passage of Sarbanes-Oxley. When, in fact, those discussions took place prior to the time of the discussions for the options. That's true. That's true. But the point is that the company admitted, and we specifically allege that the accountants knew that the company had admitted and were involved in the process of the so-called reforms, what the company called the corrective action. So they can't say they were fooled. They can't say that they were blindsided. They can't say they were duped. In the criminal case, that's exactly what the prosecution said, that Ernst & Young was fooled by the company, right? What the government said, and we have to parse this appropriately, what the government said was that with respect to certain written representations that the auditors got from the company, which was particularly appropriate, that people in the company had lied to that. Those are different representations from a different time frame that have nothing to do with the corrective reforms in 2003. How do we know that? Because we have pled that the 2003 allegations, they knew of those and that they knew they were false. But how do we know that's inconsistent? Because in the record – Could I finish my question? I'm sorry. How do we know that that's inconsistent with the evidence that the government was considering when it came to the conclusion that Ernst & Young was fooled? In the record is the indictment, and it's clear from the record that that indictment covers certain written representations. But even if that were the case, let's assume that at the time of 2003 reforms, Ernst & Young got specific representations that were inconsistent with what they knew, because they were supervising the reform activity, that said all our options activity has just been fine. That creates a conflict, but that does not plead us out of the case. It's important to realize that the question is not at this point whether management were great, whether management were charlatans. The only question is whether the accountants possessed scienter as of the time they made the statement in 2005. The other stuff is background noise. Now, the second basket of allegations that also independently supports scienter deals with – but it's important to me that the prosecutors who had investigated thoroughly this company and the transactions came to the conclusion – I mean, if they came to the conclusion that Ernst & Young was lied to and misrepresentations were made to them, to me that would support an innocent explanation as opposed to an inference of scienter. Well, that you have – not as to the specific instances we're talking about, but more generally let's assume that that is true. Even if an auditing client makes a misrepresentation to the auditor, that's not the end of the story. They cannot blindly rely on that. They have to do something. What we have presented in our allegations indeed fit the profile of situations where there is no audit or whether there were highly dubious conduct and they didn't probe on that. So even if Your Honor's hypothetical is accepted, we assume that that's not the end of the story and it doesn't address the question definitively of what their state of mind was in 2005, which is the $64 question. Now, the other cluster of facts deal with the e-mails. And the e-mails reflect a situation in May of 2000 which dealt with the largest grant in the history of Broadcom. And what do we know from the e-mails? And I would say that, yes, the e-mails may be susceptible to the contradiction that Broadcom's management were not angels and were not pure as the driven snow. And indeed that may or may not be the case, but that's not the point. The point is whether they show and whether they're evidence that show that Ernst & Young knew that there was a problem. And so what do we have in the mail? Isn't the issue with respect to the e-mails whether the Broadcom officers who are quoted in the complaint, whether those e-mails really provide an inference that EY knew or was deliberately reckless regarding the accounting validity, Or, on the other hand, perhaps those e-mails simply show that Broadcom had its own concerns about the implications. How do you get to EY in those e-mails? How you get to EY is because the e-mails present, and this I don't think is in controversy, what they present is a debate. What they present is an intense debate. And what they present is that E&Y specifically addressed the problem. The problem being that between the time of the supposed grant in May, the stock price was then at $181. When E&Y started looking at it in the summer, it had jumped to $231. E&Y had clearly noticed that and clearly said, well, if this option grant isn't good, we're going to make you take a $700 million charge. And your position is they inquired into that, but they didn't inquire far enough because they never got documentation to legitimize those grants. The issue, that is true. That is true, but that is two steps down the road. The first step down the road. You're doing that because you only have a minute left. I know. Thank you. The key question is that it shows that they knew the problem. They knew that there was an options-baiting problem, and we say they caved. And that's a compelling inference, and the inference on the other side is that the emails show nothing. And we say that what we have presented, which is good enough for now, is a story and a compelling inference. And the final one, since I'm running out of time, is the dead director and the fact that half a million dollars worth of options were granted on Christmas Eve, and they give that the back of the hand. And we say that that, coupled with the fact that we allege, which has to be taken as true, that they knew that there was a dead director who was on the compensation committee, they knew that that was unauthorized, and if they just give the back of their hand to a half-a-billion-dollar transaction on Christmas Eve, that alone shows scienter. That alone. But you have to prove. I mean, you can't just say they knew under the hiding-pleading standard. You have to say how you knew, how, I mean, what in the records shows you that they knew. They might have thought one person, one director could authorize it, but there's nothing in the complaint that says how they knew this was in violation of the protocol for the company. We allege that they knew that the compensation procedures, and we allege that they specifically knew that the director was dead. And we submit that that has got to be taken as true, and we submit that that is good enough to be part of a mosaic of a story, an inference that is sufficient. So we have three clusters of allegations that we submit are each independently sufficient. Thank you. These cases are so difficult because of the extremely heightened pleading standard. Well, they aren't. It's a close case. Well, we are very lucky in this case that we have the e-mails. We are also very lucky that we have the admissions after the fact by the company as to the details of the 2003 reforms. We are not aware of any other case where we have had a story that has been laid out by the company of internal reforms before the critical statements were made. So if you knew of the reforms, you knew that the statement was false. That's a very, very rare circumstance. It's a little more difficult, though, because you're looking at a 2005 statement and trying to say that at an earlier period of time they had to sign into it. That's what makes it. If you had the, you know, if the years tracked the reports, if the reports were for those particular years, you'd have a stronger case. No, the years, no, I beg to differ. The years tracked precisely because one has to keep in mind with this four-year lag period that 2003, had things in their statement, in their financial statements that were carryover. And most importantly, paragraph 367, 367 says Mr. Blythe, who was a partner of E&I, was there throughout the entire time. So even if we have to show, which is a theoretical debate we don't have to have, that even if we have to show that one person was there and this knowledge was in his head, we have alleged Mr. Blythe is the guy. Right. I understand. We understand. Thank you. May I ask one question? Sure. Are there any other cases that you have found where they found Scienter as necessary, a stock option backdating case? No. No? No, we haven't. And that's why we think this one is uniquely strong because of a series of atypical facts that probably will never repeat itself. Close case. Thank you. All right. We'll give you a minute for rebuttal. Thank you, Your Honor. Appreciate it. Good morning. May it please the Court, Robert Hubbell of Gibson, Dunn & Crutcher, for Defendant and Appellee Ernst & Young. There are two separate grounds on which this Court should affirm the District Court below. The first is the failure to allege with particularity the facts showing a strong inference of Scienter. And the second, equally important, is the failure to allege loss causation as to Ernst & Young's 2005 statement. We didn't get much help from the District Court, did we? With respect to loss causation, the Court did not address that because the ---- With respect to anything. I believe the record, however, Your Honors, has been fully briefed and is properly before the Court and can be affirmed. What about the District Court's comment that Scienter allegations against auditors carry a heavier burden? Do you agree with that? No, Your Honor. To the extent that the actual ruling of the Court is embodied in the order entered by the Court on the motion to dismiss, and the clear precedent of this Court is that the actual written ruling should be the matter of ---- I was just asking whether you agreed with that comment. The pleading standards as to auditors are the same as all other defendants. Ernst & Young agrees with that. However, auditors occupy a different position with respect to a company fraud. They are not the company. They did not create the unanimous written consents. They did not undertake the fraudulent conduct. They are effectively independent third parties who are looking at evidence presented by the company and testing that evidence on a sample basis. Counsel, did you prepare the order that was signed by the judge? Yes, Your Honor. We did prepare an order. That creates a problem, you know, as a practical matter because it's really difficult to know, you know, exactly what the judge was deciding when he adopts almost verbatim the order from one of the parties. It shows a lack of independent resolution, in my view, when the judge adopts wholesale the order that's submitted by the prevailing parties. I understand, Your Honor, and this Court is reviewing the dismissal de novo. And I believe that the record before this Court makes clear that plaintiffs have failed to comply with the Reform Act either as to scienter or as to loss causation. Can I have you address your opponent's position specifically as follows? What are your arguments for any more compelling, innocent inferences with respect to either the May $2,700 million option grant or overseeing the 2003 corrective reforms? Don't we have here at least equally compelling inferences and, therefore, the case should continue? No, Your Honor, we do not. Because? Because. With respect to the 2003 reforms, those reforms, in fact, were responsive to the Sarbanes-Oxley Act, which became law in July of 2002. The SEC had to enact implementing regulations. Those regulations went into effect relating to internal controls, such as stock option lending. They went into effect in July, I'm sorry, in June of 2003, which is precisely when these so-called corrective changes went into effect. Now, Broadcom made no statements in June of 2003 regarding those corrective changes. It did make statements four years later after an investigation, after a restatement, when it was attempting to reassure investors to say the stock option problems are in the past and as evidence, dear investors, look at the changes that went into effect in June of 2003 pursuant to the Sarbanes-Oxley Act. So that's not evidence of scienter. That's evidence of compliance with a regulatory change. All companies throughout the United States were required to comply with that. Moreover, Ernst & Young didn't, quote, preside over those changes. Ernst & Young had a statutory and a regulatory obligation to look at internal controls and report prepared by management for the first time required in June 2003 and report on that. But importantly, the statements that New Mexico relies on were not made in June 2003. They were made after the restatement and after the investigation. Now, with respect to the major ---- How could you certify in 2005, the prior years, when you knew about the stock option backdating, when you knew about what we'll call the Christmas Eve massacre, when you knew about the dead member of the compensation committee who was supposed to approve that and it wasn't done correctly, when you specifically asked for documentation to support the option grants and never got that documentation? You asked for it and never got it. You never pursued it. Well, Your Honor ---- That's the allegation. That is the allegation. But isn't that enough to keep the case going? Because that allegation was taken word for word from the indictment and from the SEC complaint against former officers and directors of Broadcom. And if you look at those pleadings, which I urge the Court to do, on these same allegations with respect to the May 2000 grant, the government looks at those e-mails and says not that Ernst & Young was a perpetrator of the fraud, that Ernst & Young was a victim of the fraud, that in fact Ernst & Young did raise certain issues and was lied to and the Broadcom officers and directors were prepared to prepare false documentation. Now, the May ---- In response to opposing counsel's observation that the government was talking about different statements when it made the assertion that Ernst & Young was a victim, what other statements could possibly be referenced? I think, Your Honor, that makes my point exactly. In fact, New Mexico's burden is to show that Ernst & Young acted with Scientia in making the 2005 audit opinion or issuing that opinion. And because the complaint below is silent, it's devoid of any detail regarding the Scientia at that time, New Mexico reaches back three to six years dealing with statements that have nothing to do with the 2005 audit and tries to backfill Scientia with respect to the 2005 audit opinion. Now, the only thing that Mr. Doves has said is that, well, there was one member of the engagement team who was on the audit from 2000 through 2005, but he didn't say that there's any detail in the complaint that shows that that member, Mr. Blythe, in 2000 had any knowledge regarding fraudulent conduct at Broadcom. Wait a minute. EY gave an unqualified audit opinion in 2005 attesting to three years' worth of financials. The cyanide cannot be found because plaintiffs have not connected the same individual as being involved throughout the different years? Isn't EY EY? EY was there through all those years? I'm not making that argument, Your Honor. I'm making the argument that it's New Mexico's burden to establish that in the first instance, in the first instance, a member of the engagement team had that knowledge. And that they failed to do. They skip over the foundational fact and simply say, as is usually the case, members of the engagement team do stay on from year to year. But that doesn't relieve New Mexico of its burden of complying with the particularity requirement under the Reform Act. If I may, Your Honors, I have just a few minutes left. I do believe it's vitally important to address the loss causation issue. I just have to tell you I'm reluctant to do that in light of the fact that the district court decided not to address that issue. With respect, Your Honor, may I just briefly say I don't believe there's any reason to wait. The facts with respect to the disclosures in 2006 and 2007 and the market reaction to those facts are not going to change. But the district court here held, as I recall, that that issue was more properly dealt with at a later point when additional evidentiary support would be available. And in any event, are you saying that we should skip over him and decide that ourselves at this point? No, Your Honor. First of all, that holding was with respect to statements by other defendants, other statements, a different fact set. With respect to Ernst & Young, there is a single misstatement alleged in 2005. And under Duro, plaintiffs must show that there was loss causation as to that statement. Now, Judge, the court below did not reach this issue with respect to Ernst & Young. It is fully briefed. It is before this court. The facts are not going to change. You spent a lot of time on that argument in your brief, perhaps lacking faith in your earlier argument. I do not. And I'm happy to return to my earlier argument, which is that if you look at the indictment and the SEC complaint, in particular, I urge the Court to look at, for example, paragraphs 55, 54 and 55 of the indictment. This goes to the May 2000 grant, which is the centerpiece of New Mexico's argument. And it addresses the very e-mails, the very documents that were falsified in preparation for providing them to Ernst & Young during the course of the audit. I have about a half a minute left. I'd like to reserve that time in case Mr. Dobbs comes up with a new point. You don't get to. Unfortunately. So if you want to use it, use it now. I would simply urge the Court to affirm the dismissal. This is before this panel on a de novo review. The requirements of the PSLRA are clear, both as to Scientia and to law specialization. Thank you very much. All right. Thank you. One minute for rebuttal. Thank you. It will be a quick one minute. The government's indictment do not deal with the issue of the reforms. They deal with the May 2000 grant. It's not our centerpiece. We have three stools. That, at most, is one of the stools. The government indictment is silent on that issue, period. The competing inference on the other side is that the fraudulent backdating and all the discussions in the e-mails were mere technical accounting discussions. I think if one reads those e-mails, whatever else is going on, it's not a dry technical accounting discussion. And no one says it's going to be a $700 million charge and we're not going to let them get away with it if it's a dry technical accounting discussion. Beyond that, they also, we say that the arguments and the compelling interest on Sarbanes-Oxley, we get at least that. Under Tell Labs, a tie goes to us, at least for the time being. We think on each one of these three arguments we have at least a tie. As to the loss causation, Judge Reel did not reach it. Indeed, he reached it as to the other plaintiffs, and he said it wasn't good enough, and then we fixed it, and he was satisfied with how we fixed it. So I don't think it's before this Court properly, and even if it is, we have given a detailed story, which is all that's required under Dura, because there is a pleading decision. We've given a detailed outline of why we think three drops, each of which has a statistical significance over 90 percent, why those three drops deal with the disclosures. Their theory is that a disclosure has to be an exact mere drop and that nothing counts other than a disclosure saying, you know what, we lied in the 2005 opinion. And anything short of that. All right, Counselor, your minute wasn't as quick as you thought it would be. Thank you to both Counselors. Thank you. The case just argued is submitted for decision by the Court. The next case on calendar for argument is Kaiser Foundation Hospitals v. Sebelius.
judges: Zouhary, Goodwin, Rawlinson